[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On April 18, 1995 the Probate Court for the District of North Branford decreed that there was sufficient evidence to conclude that John H. Moynihan predeceased his wife Minna P. Moynihan. Paul S. Moynihan, an heir of said John H. Moynihan, instituted this appeal from that order and decree.
This presents a trial de novo to decide the sequence of deaths of this husband and wife. This is not an attempt to determine the exact time of the deaths. If Minna survived her heir's inherit. If John survived his heir inherit.
Paul S. Moynihan called Faripour A. Forouhar, M.D. and Michael Kashgarirn, M.D., as witnesses.
Minna P. Moynihan called Cyril H. Wecht, M.D. and Malka Shah, M.D. as witness. The credential of each expert were not questioned as to qualifications in their fields.
No one of the above doctors were eye witnesses to the termination of either life. Dr. Shah performed the autopsy on the remains of both bodies.
On Thursday, March 11, 1993 an employee of a local plumbing company entered the house of the Moynihans, left the newspaper on the table and spoke to Mrs. Moynihan He decided everything was fine. About 5 p. m. on the same date (3/11/93) Henry Petry visited the home and spoke to John Moynihan. He also concluded that they were fine.
There was no contact on March 12, 1993.
On Saturday, March, 1993, Mr. Petry again visited the home, looked at them and concluded both had expired. He left the home to attend a brief funeral service. He returned with a friend who subsequently summoned the police.
The police conducted their investigation and called an undertaker. The undertaker removed the remains to his unheated garage where they remained until visited by a medical examiner CT Page 3406 about 5:30 p. m to 6 p. m. on Sunday, March 14, 1993. He filed his report as required.
The bodies were transposed to the office of the Chief Medical Examiner on March 15, 1993.
On March 16, 1993 autopsies were performed on both bodies. The cause of death of John Moynihan has been certified as "Sudden death associated with generalized atherosclerotic cardiovascular disease" and his manner of death has been certified as "Natural". The cause of death of Minna Moynihan has been certified as "Hypertensive and atherosclerotic cardiovascular disease with cardiomegaly. Other Significant Conditions: History of Parkinson's disease". The manner of death has been certified as "Natural".
The above identified expert witnesses testified and expressed this expert opinions. All had available the same evidence and hypothetical question based on the evidence of record. One witness was unable to express an opinion with reasonable medical probability as to which of these two people survived because he didn't have any evidence that could help him make a distinction that would be reliable evidence as there are many variables. He concluded it impossible to give an opinion with reasonable probability to state which one survived the other.
Another expert did not feel that there can be any specific determination of the sequence of events as to what, who, whether either of the decedents died one before the other or approximately, at approximately what time they died.
The remaining two experts took positions and indicated the positive factors that provided "evidential underpinnings" that support their opinions.
Three of the experts were given a hypothetical question based on the evidence or records. Dr. Shah's opinion was predicated on her "hands on" autopsies of both remains and the hypothetical question as presented to all experts. In her opinion, as stated in the autopsy report, John Moynihan died prior to Mrs. Moynihan. Dr. Shah's opinion was predicated on her conclusion that as caretaker of his wife, if something was to go wrong Mr. Moynihan would notice it first as opposed to her noticing him dying. More than that, scientifically, when I examined the body, including the scene pictures, there is more decompositional changes on Mr. Moynihan than on Mrs. Moynihan, considering all environmental factor, which CT Page 3407 most of the time change the decomposition changes, which have remained constant for both the bodies. And, knowing that, the decompositional changes which are more of Mr. Moynihan than Mrs. Moynihan, I concluded that Mr. Moynihan died first, then Mrs. Moynihan. (See also p. 6, exhibit 18 — postmortem report).
"Q The — Haven you prepared a series of slides of both bodies based on photographs that were taken during autopsy?
A Yes. I is routine for me to, prior to an autopsy to take photograph each and every case.
Q Now, these photographs were taken of the bodies before you actually conducted the autopsy?
A That's correct.
Q And, do those — Will those photographs help the Court illustrating your opinion as to who died first?
A I think so. It can — It illustrates the decomposition changes very obviously, that how much advanced changes are for Mr. Moynihan than compared to Mrs. Moynihan."
The "evidential underpinnings" of Dr. Shah's testimony quoted above when considered with the photographs in evidence [Plaintiff's Deposition # 22 — 12 photographs 12/19/94] and the evidence presented in the slides shown to the experts during direct and cross-examination present the "evidential underpinnings" necessary to support Dr. Shah's opinion that Mrs. Moynihan died after Mr. Moynihan died.
Dr. Shah explained the obvious decompositional changes noted in Mr. Moynihan's autopsy report and explained skin markings as seen in the photographs. She further explained that lividity which is identified as the settling of blood in the body due to gravity. It is the rate of decomposition. First comes lividity then comes skin marbling. Mrs. Moynihan's body did not show skin marbling at autopsy. Dr. Shah indicated that the most important factor indicating the rate of decomposition is the environmental temperature and that if the bodies are kept together in the same environmental temperature, it would be possible then to determine the order of deaths by assessing the decomposition in the two bodies. CT Page 3408
This Court finds that sufficient evidence exists to conclude that Mrs. Moynihan died sometime around, between 10:30 p. m on Friday the 12th, and 1:30 a.m. in the morning on Saturday the 13th i.e. 9 to 12 hours before she was found. It was Dr. Wecht's opinion that Mr. Moynihan had been dead somewhere around twenty-four hours, a little less, around twenty-four or possibility a little bit more, but around there before the bodies were found. There is no doubt she survived him.
The order and decree of the Probate Court For the District of North Branford, District 009 In the matter of Minna P. Moynihan and the matter of John H. Moynihan dated April 18, 1995 is affirmed.
John N. Reynolds Judge Trial Referee
"Evidential underpinnings" supporting the opinion of Dr. Wecht attached as addendum for convenience.
BY MR. GALLAGHER:
Q I am going to ask you a hypothetical question. And I've done this once before. But let me, and I want to tell you before I start my hypothetical question that when I allude to the testimony of Mr. Henry Petry, he has not yet testified in this proceeding. And I'll try and indicate that as I go along. I take it that's not going to be a problem.
MR. EVANS: That's no problem. I take it he will testify to what you say he's going to testify to.
MR. GALLAGHER: Yes.
MR. EVANS: That's fine.
 MR. GALLAGHER: That's Mr. Petry who will testify —
MR. EVANS: Yes.
MR. GALLAGHER: All right.
BY MR. GALLAGHER: CT Page 3409
Q Let me ask you to assume covering the time period from March 11, 1993 through March 16, 1993, the latter date being the date of the autopsies, and I am going to ask you to assume as part of this question the autopsy reports and death certificates that you reviewed, the autopsies that were performed by Dr. Shah, the police reports as they are all in evidence, nearly all of them are in evidence, as well as the black and white photographs of the scene, as well as the color photographs of the bodies.
And assume also that the bodies of Minna Moynihan, age eighty-five and her husband, John, age eighty-six were found by Henry Petry, a nephew of Mrs. Moynihan at approximately 9:50 a.m. on March 13, 1993, that Mr. Petry had stopped at the Moynihan home to check the couple on his way to attend a funeral service and found the couple dead.
The weather conditions on all days that we are talking about, this was the storm of century, so-called, March 12th and 13th date, and that the weather outside was below freezing. Mr. Petry had stopped at the Moynihan home to check the couple on his way to attend a funeral service.
His testimony and the testimony of others concerning the premises was or will be in this proceeding that it was heated to very hot, an average of eighty to eighty-five degrees, that it was uniform heat throughout the house and that the source of the heating was radiant heat.
Mr. Petry proceeded to the funeral service and then returned to the house with his friend Dr. Hausman shortly after ten o'clock in the morning and immediately notified the police and the police were on the scene at approximately 10:30 that morning.
That previous to the March 13th date Mr. Petry had been in the premises on Thursday, March 11 at about 5:00 p. m. and spoke to Jack Moynihan and it was at this time which was his last visit, other than the 13th that the temperature was also eighty to eighty-five degrees. And that on March 12th there was no contact directly by anyone who has testified or has given evidence in this matter with Jack or Minna Moynihan.
On March 13th at 9:00 a.m. the report of the South CT Page 3410 Central Regional Police Department indicates that Mrs. Moynihan was found in a fetal position in the east bedroom. Mrs. Moynihan — I said 9:00 p. m. I beg your pardon. It should have 10:30. Mrs. Moynihan was wrapped in blankets. Her body was cold and rigid and photographs reveal that Mrs. Moynihan was lying on her right side with her face and nose buried in a pillow and with blankets covering her.
Mr. Moynihan was in the west bedroom. His body was described as cold but not quite as rigid. He was wearing underpants and a tee shirt and the photographs reveal Mr. Moynihan lying on his right side with his thighs and knees flexed at nearly fifty, or at nearly ninety degrees, his arms clutched in a roll of paper towels, a large area of dark staining was on the sheet and appeared to have extensively flowed to the side of the bed and onto the floor and carpet. The report noted that Mr. Moynihan had aspirated a very dark fluid.
The testimony of Mr. Petry and Mr. Hausman was that Mr. Moynihan appeared to them, to Mr. Petry shortly before ten o'clock and to both of them shortly after ten o'clock as he appears in the photographs without the blanket covering him. And further, the police officers had testified contrary that the blanket had been covering Mr. Moynihan or partially covering him and that one of the officers had pulled it down in order to conduct his investigation. There is also evidence that the blanket was an electric blanket. There is no testimony as to whether the electric blanket was in operation.
The Connecticut Chief Medical Examiner's Office was notified at 10:40 p. m. Dr. David Bergman examined the bodies at the funeral home on March 14th at 5:30 p. m. I believe the information is in the autopsy report which I have asked you to assume. In the funeral home garage Mrs. Moynihan's body was lying prone in the disaster body bag with her hands cupped at her face. Decomposition and foul odor and skin discoloration were observed. And these are noted in the doctor's autopsy report. There was no rigor mortis.
The body of Mr. Moynihan was on the funeral home gurney in a supine position, decomposition with a foul odor and skin discoloration, were noted and there was no rigor mortis. The couple had last been seen on March 11th by Mr. Petry and an employee of a nearby plumbing business near the CT Page 3411 apartment.
I would ask you to assume also the contents of the Medical Examiner's report and I will not go into that, the questions, except to note that you would assume the contents of that report.
Assume also that the funeral director arrived at the premises sometime after the police in the vicinity at 10:30 or so in the morning of March 13th and removed the bodies in vinyl or plastic body bags and removed them to his garage at about 11:30 in the morning on this day and that they stayed together in the garage which was not heated, and as I indicated, the weather was quite cold until transported to Farmington for the purpose of Dr. Shah's autopsy to transport on Monday, March 15th and the autopsy on Tuesday, March 16th. And that in transit as well as while the bodies were at the Medical Examiner's office they were kept together in the same general temperature.
Based on the assumed facts and the assumptions and the documents that you have reviewed and I have asked you to include in this question, do you have an opinion based on reasonable medical probability as to the order of deaths of John and Minna Moynihan?
A Yes, I do.
Q And what is that opinion?
A It is my opinion that considering all of these things that you have set forth and with references to the various reports that Mr. Moynihan had died before Mrs. Moynihan.
Q Are you, before we get into the details and the basis for your opinion, Dr. Wecht, are you able to quantify it, quantify the time difference?
A Yes, within a range. Not precisely in terms of a minute or even a specific hour on the clock.
Q All right. Would you tell the Court what the range is or, this? CT Page 3412
A In my opinion, Mr. Moynihan had been dead somewhere around twenty-four hours, a little less, around twenty-four or possibly a little bit more, but around there. And there is a margin that must be given on either side of six hours or so, something like that.
I believe that Mrs. — let me say this. I do not believe that Mr. Moynihan had been dead any less than twelve hours. I believe that it's closer to around twenty-four. And don't believe a lot more than twenty-four. This is, of course, with reference to the times that the bodies were found.
The death of Mrs. Moynihan, I believe, would have been somewhere like around nine to twelve hours before she was found. So I would say that dealing, you know, taking the average, a difference in the two of somewhere between maybe six to twelve hours, something like that.
Q All right. Now if I take the, you said that your time frame, your time of reference, nine to twelve hours, twenty-four hours, with the variables that you have indicated, are from the 10:30 a.m. arrival of the police on March 13th, is that a correct —
A Well, yes. When I give those times, that is the reference point because there are, you know, later times, different observations and so on. So I'm talking about the time at which the bodies were found on the morning of Saturday, March 13th.
Q Okay. Now, I just wanted to establish for the Judge's reference that we, based on the opinion that the twenty-four hours prior to Saturday, March 13th at 10:30, would have been sometime around 10:30 a.m. on Friday and nine to twelve hours prior to 10:30 a.m. on Saturday would have meant that Minna died sometime around, between 10:30 p. m. on Friday, the 12th, and 1:30 a.m. in the morning on Saturday.
A Yes. Yes, yes. Around that, exactly.
Q Okay. Now, and I'm sorry that, I just wanted to get that out clearly and first. Would you tell the Court the basis for your opinion? How did you reach this opinion? CT Page 3413
A There are three areas of pathological observation which formed the basis for my opinion. One is rigor mortis, which is body stiffening after death. Mr. Moynihan was less rigid than Mrs. Moynihan.
Now Mr. Moynihan showed much postmortem change, what we call postmortem decomposition which clearly indicates, of course, that he had gone into rigor mortis and was now coming out of it. Body stiffening will commence on average oh, maybe four to six hours after death in a typical case and around ten to twelve hours maybe eight to twelve hours it will become fixed and it will remain fixed for about another twelve to twenty-four hours or so and then it begins to break down, the body begins again to become somewhat flaccid. So the fact that he was not fully stiff in the presence of postmortem putrefaction postmortem decomposition, indicates that he was on the down side, what we call lysis of the postmortem.
Mrs. Moynihan on the other hand, was quite rigid, which tells me then that her state of rigidity was at an earlier point in time. She has not reached that point in time at which the rigor mortis would begin to break down. So that's one factor.
The second factor is livor mortis, which refers to the settling of blood after death. This is the settling essentially by gravity of the blood in those parts of the body which are dependant at the time of death. That, of course, obviously relates to the position of the body, except for the firm points of contact where where will be some blanching, the other parts that are more downward, so to the speak to whatever surface you are lying on, there will be what we call dependent lividity, sometimes referred to as hypostasis.
Now that will begin to form, oh, a little bit after four, six hours and then after ten, twelve hours it becomes fairly well fixed in that area. If the body is moved sometime after livor mortis begins to develop, then you can get a second pattern of livor mortis relating to the second position into which the body has been placed.
In the case of Mrs. Moynihan, she shows us two patterns of livor mortis. She has one on dependent portions of the body on the right side, which is the position in which she was found lying. Now her body was then placed face down. CT Page 3414 We call a it prone position in the disaster bag or the body bag. And we then see when her body was subsequently removed the second pattern or livor mortis on the front of her body in the dependent portions.
What that tells me is that livor mortis had begun to develop, formed a pattern on the right side of the body, but she had not been dead for very long. Certain less than twenty-four hours or so because there was a new second pattern of livor mortis that was able to form on the anterior or front parts of the body because she had been placed face down in the disaster bag.
Conversely, Mr. Moynihan who had also been found somewhat on his right side, at his autopsy he shows the pattern of livor mortis on that right side, but while his body had been placed face up supine in the disaster bag, we do not see a second pattern of livor mortis on his body, which would then have been behind in the posterior dependent portions of his body on his back.
The reason that there is no second pattern of livor mortis on Mr. Moynihan is because he had been dead longer. And once you have been dead for around twenty-four hours or so and the postmortem decomposition putrefactive changes begin to develop, then it is not likely that you will form a second pattern of livor mortis.
So the fact that we have a second pattern of livor mortis on Mrs. Moynihan tells me that she had been dead a shorter period of time allowing for that second pattern to form with the new position of her body in which it was placed in the body bag. And the fact that there was no second pattern of livor mortis on Mr. Moynihan tells me that he had been dead longer, too long for a second pattern of livor mortis to form on his body based upon that changed position in which he was placed. So that's the second reason.
The third reason, which I believe is the most important, most definitive if I have to rate these, well, if I have to, I do rate them as a forensic pathologist how I would rate them. The third is the most definitive and I guess in its way the most dramatic.
If you look at the autopsy reports and you go down CT Page 3415 them beginning with the body externally and you place them in front of you from external to internal and you go down through the organ system, you will find time after time significant differences between the two bodies. The differences are very great. And they are consistent from one organ to another.
The changes on Mr. Moynihan of a decomposition nature internally showing putrefaction of soft body organs and tissues are much more advanced than on Mrs. Moynihan. The blood referred to in the lungs in Mrs. Moynihan is referred to as blood. In him they talk it as being hemolyzed, the process of red blood cells breaking down.
Then we come back outside to the body first. Mr. Moynihan had what is referred to as subcutaneous emphysema. These are large blisters that form beneath the skin in people as they begin to under decomposition. And she did not have that.
In the liver they talk about these big putrefactive cysts bacterial decomposition in his liver. She did not have that. They talk about autolysis which means breakdown of your body tissues caused by your own enzymes and chemical substances and bacteria in your body after death. She had this. She did not have this at all, and he had it significantly in the pancreas and reference in the stomach and so on.
So you have these very significant differences in the postmortems. Then when you keep in mind that you are dealing with two people who are the same age, eighty-five and eighty-six, they died in the same ambient temperature, the same overall milieu, the treatment and handling of the bodies subsequently was essentially identical in terms of temperature, movement, etcetera.
You put all of that together you have a kind of a controlled experiment. You've got two dead bodies that have died in the same place, everything pretty much is the same and subsequently, after their discovery, everything is pretty much the same. So all of that and together leads me to the conclusion that Mr. Moynihan died before Mrs. Moynihan.
Q Let me ask you a question, Dr. Wecht. Would the fact that the covers had been on Jack Moynihan, let's assume CT Page 3416 just a blanket, a normal blanket, or an electric blanket that wasn't functioning, would that have made any difference in your opinion?
A Well, no, actually, if the, you know — okay. The answer to your question is no. It would not have made any difference if the cover had been on and she had blankets on her. If you put blankets on him it makes it even more uniform. So the simple answer is no. It would not make any difference in my opinion.
Q Now the — Dr. Shah took several slides. They're